(21 App. Div. 276.)

LAKE v. WENDT et al.

(Supreme Court, Appellate Division, Fourth Department.   October 15, 1897.)

1. TRIAL—INSTRUCTIONS.
    Where there was direct and positive evidence that the implement, the alleged defects in which caused the injury sued upon, was the implement produced in court, and there was no evidence to the contrary, it was error to refuse a request to charge that there was no evidence that such implement was not the precise one used on the day of the accident.
2. SAME.
    It was error to charge that a servant could recover if an implement furnished by the master "was in a defective and dangerous condition, from any cause, at the time of the accident," and that such defective condition caused plaintiff's injury, as it might have been understood by the jury to allow them to find some fact not shown by the pleadings or proof.
3. SAME—HARMLESS ERROR.
    Such error was not harmless, where the charge was given after the jury had retired, and had returned and asked for further instructions, though the correct rule of law was given in the body of the charge.
    Ward, J., dissenting.

Appeal from trial term, Erie county.

Action by Sidney Lake, as administrator of the estate of Richard T. Hargreaves, deceased, against William F. Wendt and another. From a judgment of $1,000 for plaintiff, and an order denying a motion for a new trial, defendants appeal.   Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Frank Brundage, for appellants.
Frank C. Ferguson, for respondent.

HARDIN, P. J.   On the 24th of July, 1895, the intestate was in the employ of the defendants, who were carrying on a foundry and machine shop in the city of Buffalo; and in the complaint it is alleged that he "received severe and fatal injuries from the breaking of a chain pulley, by the use of which he was engaged, with other employés of the defendants, in handling a heavy iron casting, from which injuries he soon after died."   The complaint alleges:

"That the said chain pulley at the time of the said fatal injury to the said Hargreaves was, and for a long time prior thereto had been, badly out of repair, and then was, and for a long time had been, an improper and unsafe appliance, tool, and machine with which to do the work required by the defendants to be done with it, of all of which the said defendants had notice and actual knowledge at the time of such injury; that the breaking of said chain pulley, and the said accident to the said Hargreaves, happened wholly by reason of the negligence and carelessness of the defendants in allowing the said chain pulley to be and to remain out of repair as aforesaid, and to be used in that condition, and in not providing the said Hargreaves a reasonably safe place in which to work, nor a reasonably safe appliance and pulley with which to do the work required of him by the defendants as aforesaid."

Upon the trial the theory of the plaintiff was:

"That, when the hoist was being used in the lowering of a load, when the chain got to a certain point it would sometimes slip a link, letting the whole burden down suddenly for a few inches, and stopping with a jerk or jar.   When this happened the worm wheel would be suddenly pushed around fast, and it would crowd the worm into its bearings.   As long as the bearings held, and the

jacket remained on the device, nothing further happened. The repeated slippings, however, of the chain, and the repeated blows given to the jacket by the worm as it was crowded against the jacket by the worm wheel, finally so weakened the jacket that on the occasion when the injury occurred this thing happened, namely: The chain slipped as before. The slipping made the worm wheel crowd against the worm as it had before, and this time it was sufficient to break off the jacket and the bearings, and allow the worm to drop out from the cogs of the wheel. Then there was nothing to hold the device from running down, and it did run down with the crush," and the plaintiff received the injuries from which he died.

To establish the allegations of the complaint, the plaintiff relied largely upon the testimony of Wright and Heimerle. After describing the operation of the hoist, Wright says:

"There is no possibility of that lifting chain slipping from the drum when the apparatus is in perfect repair,—in perfect shape." Wright says that some two months before the accident "the chain and pulley had been out of repair." He testifies that it was sent to one Timmons to repair, "because the chain had slipped through, and got wedged in that small hole under the side of the box. The lifting chain had a large ring on it, to keep it from lifting up or drawing into the drum. It was slipped up when it was drawn into that hole. * * * It hung in that shape over a week, and I reported it to the superintendent. While it was hanging in that shape, you could not use it. I reported it to the superintendent, Mr. Dorris. * * * I reported it to him, that the block could not be used. He said he would have it fixed. * * * I took it down, and sent it to the tool room. Mr. Timmons repaired the hand wheel. I don't think he did any other repairs on it. I observed it was badly worn,—all the parts. I observed that the screw was worn. The lifting wheel had been broken in two or three pieces, but the worm that engaged with the lifting drum was badly worn. * * * The links of the lifting chain were not exactly worn, but stretched, some of them. The effect of that would be, if one link was longer than another it would ride up on the edge of the recess. That would bring the other link still further away from the recess. Then if, in the manipulation of this machine, a link should suddenly drop down into the recess, it would make a jar, and that would cause a strain on the whole apparatus. * * * Prior to the time that Mr. Hargreaves was struck, it had that fashion of slipping at a certain point in the chain. * * * Whatever Mr. Timmons did to the machine did not affect its slipping. It always slipped at that certain point in the chain. It slipped before he did it, and afterwards. At a certain point in the lifting of the chain it seemed to drop from two to six inches. It varied according to the amount of the load on the hoist. If it was a heavy load, it would drop further. I mean, when we were using the hoist for the purpose of lifting weight, as we were using the hand chain in manipulating the hoist, there would come a time when this lifting chain would suddenly slip, and drop the chain down suddenly from two to six inches. When I first observed that, I called Mr. Dorris' attention to it. He said, 'I will have that attended to right away.' But he did not. I called his attention to it again within a few days,—the next time it slipped. Yes, it slipped more than once. I could not say definitely how many times it slipped before Mr. Hargreaves was killed. It might have been ten times, and it might have been twenty. It slipped a number of times. I don't think I called Mr. Dorris' attention to it every time it slipped. I should say I spoke to him about it a dozen times. * * * One time I asked him if we could not have that fixed. He said, 'Yes.' I told Mr. Dorris, 'That will hurt some one some day, if it is not fixed.' That was between the time I went to work there and the time he was hurt. * * * Dorris never got that repaired after I went to work there, except the work that was done on it by Mr. Timmons, that I know of."

This witness then described the circumstances attending the accident, and says:

"The engine was lifted off the block that we were assembling it on, and, being unusually heavy,—one of the largest ones,—it required the help of all the men we could get around it to push it along on this traveler to the drill press.

After that it was lowered down to the bed of the drill press. It was being lowered down. * * * It fell before they got the engine down to this bed-plate. It fell so quick that I could not see the piece in the act of falling. It made an awful racket, and I saw this man, Hargreaves, fall. I never knew exactly what struck him. The hook that held the hoist to the traveler broke. I think the pulley block was cracked, and a small piece broke out of the cast-iron shell that covered the works. I think Mr. Hargreaves was struck on the top of the back of his head." The witness continues: "I could not say whether or not the chain slipped in the block, or the lifting chain slipped on that occasion, only it made the same noise that it always had when it did slip, and from the noise I can tell what had happened from what I had seen before and heard before. * * * Whenever we had a very heavy weight on it, and reached that point in the chain, it would always slip. I don't think it would be possible for that thing to happen,—for that chain to slip in that way,—if that chain and the apparatus was in good repair."

In the course of this witness' cross-examination, he said that the only defect which he claimed in the apparatus that made it slip "was the one in the chain and the one in the drum." He adds:

"The chain slipped at a certain point in it. Whenever it got to that point, in lifting or lowering of work, it slipped. I think the chain itself was defective. One link might be longer than the other. * * * The chain slipped because it was imperfect in that way. One link was longer or shorter than another."

The witness Timmons, who was called to testify as to the circumstances of his making certain repairs spoken of by the witness Wright, said that he noticed the worm was badly worn and the worm wheels; "they mesh into each other, the worm and the worm wheels"; and that he made a requisition to get new parts; and he adds that he does not know whether these new parts were obtained, that he never put them in, and that he did not look over the lifting chain. This witness adds:

"When the chain is new and perfect, and the recesses in which the chain is made to drop the drum are all right, and the apparatus is in good condition of repair, I do not think it would slip. That machine would not run down for a weight of a ton and a half fastened to the lifting chain, when the hand chain is left alone."

The witness Phillips testifies that he worked for the defendants in July, and had been for some two months, and that he knew that the hoist slipped. He adds:

"I had seen it slip nearly every day since I had been there. It had slipped that very same day, just a short time before. As near as I can judge, it slipped probably three or four inches. Then it would stop; according to the weight that was on it. The weight would give it a teetering motion until it stopped of its own accord. It would slip down, and, as the weight would pull it down, it would kind of bound up or rebound. There was a jar when it slipped. It jarred the whole building. When this apparatus broke this day, I was perhaps ten or twelve feet away from it. I saw the whole thing give a jerk. It teetered for a moment, and there was a crash, and it all came down. I saw Mr. Hargreaves fall. I could not see what struck him. He was struck on the top of his head."

The defendants called several witnesses to contradict the evidence given by the plaintiff which we have quoted, and they produced the hoist in court, to be inspected by the jury and examined by the witnesses who testified in respect thereto. Dorris, the superintendent, said:

"That block or hoist is in perfect condition, with the exception of that hood being broke. That was not broken at all before the accident. It was in good

condition, excepting that repair which was made to the hand wheel, all the time it was used in our shop. I had repeatedly lifted heavy weights with it. About fifteen months before this accident, I picked up about six thousand pounds with that block. I repeatedly, after that, used it in the lifting of heavy apparatus. During all that time I never knew it to slip. I have handled the chain myself. Have never known of its doing so in the shop."

In rebuttal of the evidence given by the defendants, the plaintiff called Heimerle, who worked for the defendants in 1895, and who was present when Hargreaves was struck. He says:

"I had operated this hoist that morning. The chain slipped when I got near the end of the chain there. It slipped. We were lifting an engine frame. We were lowering it. I should judge it slipped about four inches, to the best of my knowledge. There was a sudden jar. It went down within three inches of the floor, and we had to raise it up again and catch another hold. It slipped three or four inches, and then stopped, and the weight was still suspended. If I am not mistaken, I heard it happen at least the day before. I heard the same noise, and I did not know what it was. I was there when Mr. Hargreaves was killed. I was looking right at it when it happened. To the best of my knowledge, they were lowering the engine. They had one of their large engines, complete, on the tackle, and they were lowering it to drill a couple of holes; and I should say it was six or eight, or maybe ten, inches from the floor, when it jarred, the same as it did with me, and it stopped, and then the whole thing came down. The tackle fell right on top of the engine, and Mr. Hargreaves fell to the floor. It jarred just as though the chain had slipped, probably four inches, and then stopped; and the jar, I suppose, was caused from the slipping. I could not see anything, only just that it slipped suddenly. I heard the noise. I should say it had the same effect as though a rope had broken or a chain had broken. The whole thing shook."

At the close of the evidence the defendants' counsel moved for a nonsuit, upon the grounds:

"First. Assuming, for the purpose of this motion, that this hoist was out of repair and the chain had slipped previous to the accident; that the deceased knew of it, or should have known of it; and that in continuing to use it after such knowledge, or an opportunity to ascertain it,—there cannot be a recovery. Second. That it appears by the undisputed evidence that he did have information as to its being out of repair, if it was out of repair, and therefore when he continued to use it he subjected himself to the risk of using it in the condition in which it was. Third. That it appears that this hoist was not out of repair, but that it was in good condition, and that the accident could not have occurred in the manner as claimed by the witness Wright. Fourth. That the defendants have not been shown to have been guilty of negligence in any manner; that it appears affirmatively, uncontradicted, that they furnished suitable and competent men to see to the repairs of all articles in their manufactory, or machinery in their manufactory, and gave them ample directions with reference to keeping the same in repair; that, if they did not do so, it was negligence of a co-employé, and there can be no recovery."

The motion was denied, and the defendants took an exception.

In the course of the charge delivered by the learned trial judge, he instructed the jury to inquire—

"Whether or not that hoist, as it was furnished and used upon the 24th day of July, 1895, was in an unsafe condition. If it was, whether it was in an unsafe condition to the extent that an ordinarily prudent person, whose duty it was to examine it and ascertain whether it was in an unsafe condition, would have discovered it. If it was, and had remained so, or if the defendants had actual notice, either to themselves or to their superintendent, then they would be charged with the duty of making the necessary repairs, or of furnishing one that would be suitable for the work engaged in."

He then commented extensively upon the evidence given by the plaintiff, referring somewhat minutely to the testimony given by

Wright as to the defective condition of the hoist, and of the notice which he had given thereof to Mr. Dorris, and also the testimony of Heimerle, and his observations on the occasion of the dropping of the chain, "or the dropping of the load that was being hoisted, producing this jerk upon the hoist and the chain"; and he alludes to the fact that Wright "testifies that the defect spoken of by him as existing prior to the time of these repairs being made had not been remedied; that, after the repairs made by Mr. Timmons, he observed the chain slipped the same as before"; and also to the testimony of Wright, where he "testifies that upon one occasion, by means of a ladder or some other means, he got into a position where he could observe the operation of this chain upon this drum wheel, and he observed, by looking at the hoist. that these links did not drop into the proper place, and about that time, or shortly after, or during the time he was employed, he called the attention of the superintendent to this situation." He then alludes to the testimony given by the defendants, "that this hoist upon this occasion was in a safe and proper condition; * * * that they have brought into this court the identical hoist that was used on that occasion,"—and the evidence given in respect thereto, to the effect that the machine or hoist was in a proper and safe condition upon the occasion in which it was used. After further commenting upon the evidence, he says that he submits it to the jury "to determine whether that hoist was in an improper and unsafe condition on the 24th day of July, 1895, and before that time, and that the defendants had knowledge of its unsafe and improper condition." And he adds:

"Even though it was in an improper and unsafe condition upon this occasion, was it in such an unsafe and improper condition that a prudent man, whose duty it was to discover it, would have discovered it? Would it, from an examination, have impressed that individual so that a suggestion would be made to his mind that it was in an imperfect and unsafe condition? If so, what was his duty? The law imposed the duty upon him to furnish proper and safe materials and implements for the men who were engaged in his employment, and to exercise that degree of care and prudence to which I have called your attention, not only in furnishing, but in keeping these implements that the men were in the use of in a proper and safe condition, in view of the dangers to be apprehended from their use."

He then proceeded to instruct the jury that:

"If the deceased had the same knowledge of these defects, if they were obvious, that the defendants had, or the defendants' superintendent had, then the plaintiff cannot recover, for the reason that the law presupposes that a person assumes the risk of the employment if he continues in it when he is furnished with improper and unsafe implements to work with."

At the close of the charge the defendants' counsel asked the court to say to the jury "that there is no evidence that the hoist and chain produced in court is not the precise hoist and chain used on the day of this accident." The court declined to so charge, and the defendants took an exception. There was direct and positive evidence that the hoist produced in court was the one that caused the injuries, and the case does not show any evidence that it was not the precise hoist and chain used, and we think the learned trial judge should have yielded to that request.

After the jury had been retired, they returned into court, and pro-

pounded several questions for further instructions. One of them was in the following language, viz.: "If we think that the hoist was in a defective and dangerous condition, from any cause, at the time of the accident, can we find for the plaintiff?" In response thereto the court observed: "Yes; if you find that that was the cause of the injury; but, if it was not, you should not." To such answer and instructions the defendants' counsel took an exception. We think the request was too broad, and that it may have misled the jury, and authorized them to find that the hoist was in a defective and dangerous condition from a cause other than that specified in the complaint, or in the evidence tending to support the complaint. We think the instructions may have been understood by the jury to allow them to find some fact or defect not specified in the complaint and particularized in the evidence, and to speculate as to the cause of the injury by reason of the falling of the hoist. It has frequently been said that a jury should not be allowed to speculate or conjecture as to some defect not proven. Bond v. Smith, 113 N. Y. 385, 21 N. E. 128. In that case it was said, "the law demands proof, and not mere surmises." In Pauley v. Lantern Co., 131 N. Y. 90–100, 29 N. E. 999, it was said, "A mere conjecture, built upon a bare possibility, will not suffice to transfer the money or property of one man to the possession and profit of another." It is insisted in behalf of the respondent that the court had, in the body of the charge, laid down the correct rule of law. However, we think, under the circumstances attending the presentment by the jury, and the instruction given in answer to their question, the jury may have been misled, and based a verdict upon speculation as to the "hoist being in a defective and dangerous condition, from any cause, at the time of the accident," and, after such speculation and surmise, may have come to the conclusion that some cause other than that specified in the complaint, or mentioned in the evidence given by the plaintiff in support thereof, "was the cause of the injury," and thereupon reached a conclusion favorable to the plaintiff. We are of the opinion that the exception to which we have referred presents error, and a new trial should be ordered.

Judgment and order reversed, and a new trial ordered, with costs to abide the event. All concur, except WARD, J., dissenting.